REYNOLDS et al. v. LOCKE et al. †

(Circuit Court of Appeals, Eighth Circuit. October 30, 1914.)

No. 4062.

1. PARTNERSHIP (§ 77*)—ASSETS—REAL PROPERTY—RIGHT TO SURPLUS.

Where a farm obtained by a partnership was taken in the name of P., one of the partners, then traded for other property under the purchaser's agreement to pay a balance of $9,000 to the firm, and the purchaser's contract was afterwards accepted by P. in exchange for certain of his own land, he thereby became obligated to account to the firm for the $9,000, and the whole surplus of $3,800 arising on a sale of the land on foreclosure of a trust deed was payable to the firm's trustee for the settlement of its affairs.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 125, 145; Dec. Dig. § 77.*]

2. PARTNERSHIP (§ 336*)—DISSOLUTION AND ACCOUNTING.

Where a partner held title to certain real property in which the firm had an equity of $9,000, and by an agreement to settle the partnership affairs such partner executed certain blank deeds to one of the partners,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied January 16, 1915.

acting as liquidated trustee, evidence *held* to require a finding that it was understood that one of the deeds should be used to convey the property to such trustee, and, this having been done, he was entitled to the surplus on foreclosure of a trust deed on the property.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 797; Dec. Dig. § 336.*]

Smith, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by S. M. Locke against C. L. Reynolds and another, with cross-bill by defendants against Locke and others. Decree for complainant, and defendants appeal. Reversed, with directions.

Thomas T. Fauntleroy, Charles M. Hay, and Patrick H. Cullen, all of St. Louis, Mo., for appellants.

J. H. Rodes, of St. Louis, Mo., and F. R. Jesse, of Mexico, Mo., for appellees.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. This case presents no controlling questions of law, but turns wholly upon questions of fact. It involves the right to a surplus fund arising on the foreclosure of two trust deeds against 400 acres of land in Audrain county, Mo., known as the "Waddingham farm." Locke brought the suit against C. L. and William N. Reynolds. They answered, denying the equities of the bill, and filed a cross-bill against Locke and the holders of the fund asserting title in themselves. The trial court entered a decree in favor of Locke. The defendants in the principal bill, the plaintiffs in the cross-bill, appeal.

The Mexico Land & Loan Company was organized in the spring of 1903, by William N. Reynolds, E. F. Pumphrey, and J. L. Galloway, for the purpose of buying and selling real property. The business, however, was not carried on through the agency of the corporation, but rather by these parties as equal partners under the corporate name. When a tract of land was acquired, it was taken in the name of the party who was chiefly concerned in its acquisition. To facilitate conveyances Reynolds and Pumphrey, who were the principal holders of titles, executed blank deeds and delivered them to the other parties, to be used in case a sale of the property was made. The business was actively prosecuted until March, 1904. It then ceased, but a settlement between the parties was not effected until the following September. In May, 1903, the company acquired title to 800 acres of land, which is referred to in the evidence as the "Waddingham farm," subject to two trust deeds. It was paid for by the company, and title taken in the name of Pumphrey. This property was later in the same year traded to a man by the name of Mathis for a farm and some city property in Illinois. There was a balance due to the company on the trade of about $9,000. A contract for a deed was given to Mathis upon his paying this balance, which he agreed to do in the following March. Before this deed was due

Mathis' equity in the land was traded for 800 acres of land owned by Pumphrey in Kansas. Pumphrey acquired Mathis' equity and became obligated to perform his part of the contract by the payment of the $9,000. Pumphrey never made this payment. As above stated, Pumphrey held the legal title to the property. This he took originally for the company; but after the trade with Mathis for Pumphrey's land in Kansas, Pumphrey occupied a dual relation to the property. He held the legal title for the company; he held the equitable title in his own right under the Mathis contract; and would be entitled to treat the legal title as his own upon paying the company the $9,000 due on that contract. Clearly he could not divest this interest of the company without the consent of his associates, and it is not contended that such consent was ever given. He afterwards sold 400 acres of the farm and applied the proceeds to his own use.

Pumphrey had drawn out and used the funds of the company, so that at the settlement he was indebted to it in the sum of $32,000. Galloway had overdrawn his account in the sum of $11,000. Reynolds had drawn out nothing, and had invested about $35,000. Notes of the company were also out at banks amounting to $31,000. The only assets of the company consisted of equities in several farms and town lots and some second and third mortgages, all of doubtful value. All the parties, from the time the active business closed until the settlement was made, had been anxious for a settlement. The correspondence which is put in evidence shows Pumphrey to have been especially anxious to turn over the property of the firm, if he could only escape its liabilities, most of which had either been incurred by him or were attributable to his excessive withdrawals of the company's funds. He had removed from Mexico, Mo., where the business of the company had been chiefly carried on, and become engaged in business at, Omaha, Neb. In the correspondence he recognizes repeatedly that the company is largely indebted to Mr. Reynolds. He also had a vague notion of its indebtedness at the banks. Reynolds resided in Illinois. About the 10th of September, he and Galloway went to Mexico with counsel for the purpose of settling up the business of the company. They had written Pumphrey to meet them there for that purpose. He failed to come, but urged, as he had been urging for some weeks, that Galloway and Reynolds fix the matters up in some way; that he was ready to turn over all his interests, either to Mr. Locke, the cashier of the bank to which they were chiefly indebted, or to Mr. Reynolds, and simply retire, leaving the other parties to pay the debts. The correspondence leaves no doubt of his reluctance to come to Mexico and face the actual situation. He was written and telegraphed to, but was only prevailed upon to come by Mr. Galloway's going to Omaha after him in person. We call attention to the frame of mind in which Mr. Pumphrey came to this meeting, because we think it has a strong bearing upon the controverted question in the case. As late as August 31st, he wrote Galloway, urging him to arrange with Reynolds to take all the property as trustee and dispose of it and pay off the debts:

"If you cannot get him to do this, make the best proposition that he will accept, as I want to close this up worse than I can tell you. I must unload.

my part in this deal, and this will unload the big end of it, and I shall feel like a young girl again."

On September 9th, in answer to the urgent appeal of Reynolds and Galloway to go to Mexico, he wrote them:

"If you can arrange with Locke to carry me a while longer, you can get an expert to go over the books and fix them up and sell the stuff and square our debts. I am so blue I cannot sleep nights, and feel as if I had had a sick spell."

This is the frame of mind in which he came to Mexico on September 11th. The evidence also clearly shows that the banks were threatening to bring suit on the company's notes, which were past due. The parties spent two days in going over the records. On September 13th they arrived at a full settlement. First it was agreed that the indebtedness at the banks should be divided, and paid by Reynolds and Pumphrey separately. One of the notes for $10,000 had been signed in the name of the company by Pumphrey. He had, however, used the proceeds wholly for his own private purpose. This note he was to take care of himself. He was also to pay $4,000 of the remaining $21,000 owing at Mr. Locke's Bank. Reynolds was to pay the remaining $17,000.

A written agreement was made, by which all of the property of the company was turned over to William N. Reynolds to be sold, and out of the proceeds the obligations of the company were to be paid. If there was a surplus, that was to be divided among the parties. If there was a deficit, the parties were to share it equally. It was further provided as follows:

"If it shall be found that either of said parties is indebted to said company, or has overdrawn more than his share of the profits of said company, the said party shall pay such amount to said company; or in case either party shall not have received his share of the property or profits of said company, such party shall be paid such amount."

This contract was signed by all three of the parties. A list of the company's property was made out in writing, and an estimate of its value placed thereon. While it was agreed that Reynolds was to manage and control the property, it was understood that either of the other parties might, if they had an opportunity, make sales, turning in to Reynolds the estimated value fixed in the list. A statement of the settlement and the list of the property was made in the form of a record of a meeting of the board of directors, and was signed by Galloway as secretary, and Reynolds as president. It was not signed by Pumphrey. The evidence is clear and convincing, however, that this record was made for the purpose of reducing the settlement to writing, and as a supplement to the written agreement that was signed by all the parties, and that this record, after it was written up, was read over and checked over by Pumphrey, as well as the other parties.

To go back to the Waddingham tract: Late in August, or early in September, Pumphrey had sent some 14 blank deeds to Galloway to be used by him in conveying the property of the company to Reynolds, if the arrangement which Pumphrey had proposed could be carried out, for Reynolds to take the property and sell it and liquidate

the company's obligations. There is a dispute in the evidence as to whether Pumphrey specified what property should go into the several deeds. He insists that he did, but the other parties who saw the letter (which had been lost) testified that no such specification was made. Reynolds and Galloway filled up one of these deeds with a description of the Waddingham tract. This deed was placed upon record on the 5th day of September. At the meeting Pumphrey knew of the deed. It was discussed while the settlement was pending. In the list of the company's property turned over to Reynolds, this tract was entered, and the value of its equity was fixed at $6,000. There is no dispute in the evidence that Pumphrey knew that this tract was entered in the list of the property. He says, however, that it was placed there simply as property which might be sold by either of the parties. That seems so inconsistent with the whole object of the list that we feel compelled to reject Pumphrey's testimony and accept that of the other parties, including Judge Whiting, the attorney who acted for Reynolds in making the settlement. The list was prepared as a list of property which Reynolds was primarily to control and dispose of for the purpose of meeting the obligations of the company, and not simply as a list of property that either of the parties might sell.

After the record was written up and the contract signed, the parties went, on the evening of September 13th, to the bank, for the purpose of adjusting their liabilities there. At this meeting the settlement was made upon the terms above set forth. The entire liability was taken over by Mr. Pumphrey and Mr. Reynolds, and ceased to be a company obligation. The old notes were surrendered. Reynolds paid $10,000 cash, and gave his note for $7,000. Pumphrey gave notes for the balance. After this meeting Pumphrey insisted that he must have the Waddingham farm to put up as security for his indebtedness, and demanded that it be reconveyed to him by Mr. Reynolds, but Reynolds refused to make the conveyance.

This presents the controversy about which the testimony is marshaled. Pumphrey insists that he never consented to the use of the deed by Reynolds for a conveyance of the Waddingham tract, and that he did not consent to the turning over of that tract to Reynolds at the time of the settlement. On the other hand, it is insisted that the letters which Pumphrey wrote authorized such a use of the deed, and that at the settlement he fully ratified the conveyance, and that he only attempted to recant from it after he had been to the bank and found that the indebtedness was larger than he expected, and that he was to be charged individually with the $10,000 note, and possibly after he had been urged by Mr. Locke to furnish him more adequate security. Locke claims under a subsequent conveyance from Pumphrey, and has no better right than Pumphrey.

[1, 2] We think that Reynolds is entitled to the fund for two reasons: (1) Under the Mathis contract the company had an interest in the land to the extent of $9,000. That exceeds the value of the equity as fixed in the list that was made at the time of the settlement, and also as appears from the actual sale of the property on the foreclosure. The fund here in controversy is about $3,800. So, quite in-

dependent of the conveyance and settlement, Reynolds, as trustee to close up the business of the company, has an interest in the property that is prior and superior to any interest of Pumphrey. (2) We think that the clear weight of evidence shows that the blank deed was properly filled up with a conveyance of this property to Reynolds; that this was done pursuant to the plan proposed by Pumphrey himself, that all the property of the company should be turned over to Reynolds as trustee, out of which he should pay, not only the debts of the company, but the debt which was conceded by all to be owing to him personally. The evidence also clearly shows that the conveyance was ratified and approved by Pumphrey at the settlement, and the Waddingham land listed as part of the land which was turned over to Reynolds. We recognize that there is some evidence to support the decree, but after a careful study of the record we are convinced that the evidence against the decree is so overwhelming that it ought not to stand.

There was some evidence to support a contention that Reynolds was estopped to claim the property by an alleged conversation between Pumphrey and Locke on the evening of September 13th, which occurred in Reynolds' presence. This evidence, however, is far too indefinite and vagrant to create an estoppel.

The decree will therefore be reversed, with directions to enter a decree in conformity with this opinion, establishing the right of the complainants in the cross-bill to the fund, and directing its payment to them, and dismissing the original bill on the merits. The allowance of $150 to the holders of the fund for their expenses in the trial court may stand.

SMITH, Circuit Judge, dissents.